*The probate of the paper propounded as the Will of* GARRET J. HOPPER.

PROBATE denied, where none of the three subscribing witnesses was positive he saw decedent sign the paper, or as to what he said, and there was no connected or coherent relation of what took place, and all the witnesses had, at one time, forgotten that such an event occurred, and there was no professional man of the law present, and the inevitable conclusion was, that the decedent executed the paper as though he were executing a deed or bill of sale.

A. H. WAGNER, *for Proponent.*
MANN *and* PARSONS, *for Contestant.*

CHRISTINA K. MARTLING, propounded the following paper:

In the name of God: Amen. I, Garret J. Hopper of the city, county and State of New York, considering the uncertainty of this life, and being of sound mind and memory—blessed be Almighty God for the same—do make, declare and publish this, my last will and testament, in the manner as follows, viz: *Imprimis.* It is my request that all my just debts and funeral expenses shall be paid by my executrixes out of my personal estate. Item. I give to my wife, Margaret, all my property, both real and personal, as I now hold it, as long as she shall remain unmarried and my widow; but if she should become married again, then the following division must be made, viz: To my wife, Margaret, I give one thousand

dollars in her own right, to have and to hold forever, to be paid to her by my executrixes within six months after her marriage. Item. I give and bequeath to my son John, a legacy of one thousand dollars, together with my gold watch, as a memento, to be paid unto him by my executrixes hereinafter mentioned, within six months after my wife's marriage. Item. I give and bequeath to my grandson, Calvin Aymar Hopper, a legacy of one thousand dollars; I give and bequeath to my grandson, James Franklin Fowler Hopper, a legacy of one thousand dollars, to be paid to them by my executrixes hereinafter mentioned, when they shall respectively arrive to the age of twenty-one years. Item. I give and bequeath to my cousin, Jemima Van Riper, a legacy of one hundred dollars, to be paid to her by my executrixes six months after my wife's second marriage. Item. I give and bequeath to my daughter, Christina, my house and lot of ground, with the appurtenances, situate in West Tenth street, city of New York, where I now reside, to have and to hold the same to her in her own right, and her executors, and administrators, and assigns forever, together with all the residual part of my property of whatsoever kind, in her own right, her heirs and assigns forever (including household furniture), which she and her mother may divide equally, or into moieties, if they choose to do so, upon her mother's marriage. Item. In case my wife should die during her widowhood, my will is that the same division and distribution of legacies as above stated upon her second marriage, shall be paid by my executrixes, hereinafter mentioned, within three months after her death, to the aforesaid individuals. Item. In the event of either of my grandsons should die previous to the time specified (i. e.,) of age, then the surviving one shall receive two thousand dollars when arrived to the age of twenty-one years.

Lastly. All the remainder and residue (if any) of my estate, of whatsoever kind, of which I shall be seized

and possessed, or to which I shall be entitled at the time of my decease, I give to my daughter, Christina, forever, whom I hereby nominate and appoint, in connection with my said wife, Margaret, executrixes of this my last will and testament; moreover, it shall be lawful for my executrixes, and I do hereby invest them with full power to call in and collect all moneys, notes and other obligations due and owing to me, and sell bank and insurance stock whenever they shall deem it proper and necessary, in order that the conditions herein contained may be faithfully carried out.

In testimony whereof, I have hereunto set my hand and seal, and publish and declare this to be my last will and testament, in presence of the witnesses named below, this 16th day of April, in the year of our Lord one thousand eight hundred and sixty-four.

GARRET J. HOPPER. [L. S.]

Signed, sealed, declared and published by the said Garret J. Hopper, as and for his last will and testament, in presence of us, who at his request, and in his presence, and in presence of each other, have subscribed our names as witnesses hereto.

> GEORGE ACHENBACH, New York.
> JAS. W. QUACKENBUSH, Hackensack, N. J.
> C. V. BANTA, New York.

John C. Hopper, son of the decedent, appeared by proctor and counsel, and opposed the probate on the ground of alleged insufficient execution of the paper.

George Achenbach, the first subscribing witness, a clerk in the Merchants' Bank, testified as follows:

Q. What is your business? A. Receiving teller in the Merchants' Bank.

Q. Did you know Garret J. Hopper in his lifetime? A. I did.

Q. Were you acquainted with the handwriting of Mr. Hopper ? A. Yes; I have seen him write.

Q. Look at that paper (the paper offered for probate) and see whether the body of it is in his handwriting, and also the signature ? A. Yes, sir.

Q. Were you present when that was executed by him ? A. I was.

Q. Where was it executed ? A. At the Merchants' Bank.

Q. You saw him sign it ? A. I think he signed it while he was in the bank; I think he drew it out of his side pocket, and asked for a pen to sign it; but that I am not so positive of; I think he did.

Q. He came there with it to the bank ? A. Yes, sir.

Q. What else was done at the time of the execution of it, as near as you can give it; state the facts as they occurred ? A. I don't recollect all the circumstances, but I recollect he made a declaration; he came in and asked me to testify to it, and asked me to ask Mr. Banta, who is also a teller in the bank, some distance from my desk, and I stepped around to his desk to tell him ; he said he would be around in a short time, that he had some business to attend to then, and he stood by my desk in the meantime; then I think he signed the paper; it was during business hours; I don't recollect all the circumstances.

Q. Look at the attestation clause, and say whether your signature is there ? A. That is my signature.

Q. State what he did, and what you did, and what was said, and the acts you did then at that time ? A. I think he signed it on a little ledger on the outside, or else a little desk, that one kept for the purpose of indorsements, and he made some declaration, holding it open, and then I witnessed it.

Q. Do you recollect what he said; the words he used ? A. I don't recollect all he said.

Q. What are your best impressions as to what was said ? [Objected to. Objection sustained; exception taken.]

Q. What is your best recollection of what transpired? A. My best impression is that he made a declaration that that was his last will and testament, in the words that are down there (alluding to the paper offered); that is my best recollection.

Q. Do you recollect reading that clause at the time you signed it? A. I am positive I must have read it.

Q. Do you recollect reading it? A. I don't recollect reading it.

Q. Please to state what you recollect, if any thing, in reference to signing it as a witness? A. I signed it on my desk.

Q. At whose request? A. At Mr. Hopper's request.

Q. Who was present? A. Mr. Banta stood at my desk, and I think Mr. Quackenbush; Mr. Hopper stood on the outside of the counter; there is a small port where deposits are passed through, and he passed the instrument through there.

Q. Did these other witnesses sign it at the time you signed it, in the presence of Mr. Hopper? A. They stood there together; Mr. Banta, I recollect, and I think Mr. Quackenbush stood there too, because I had to wait for Mr. Banta; I stepped around to Banta, and asked him to become a witness to Mr. Hopper's will; that is my recollection.

Q. You were all together when it was signed? A. Yes, sir; I know Mr. Banta was there, and I think Mr. Quackenbush was there, too; it was down at my desk.

Q. It was in the presence of Mr. Hopper, and in the presence of the witnesses, too? A. Yes, sir.

Q. Have you had any conversation with Mr. Wagner, the counsel for the will? A. I have met him once since.

Q. Where? A. I met him at Mrs. Hopper's.

Q. Have you had conversation with him anywhere else? A. I do not recollect that I have; I met him in the street the other day, and walked down with him when I was here Tuesday; I don't recollect any other time.

Q. Did you have conversation with him about the will? A. In general terms.

Question repeated. A. Yes, sir; we talked about the will.

Q. Did you talk with him about the execution of the will; what took place while it was executed? `A. Yes, sir.

Q. Did he inform you what was necessary to make a good execution? A. I presume Mr. Wagner did; I don't recollect that.

Q. Did you tell Mr. Cochran and Mr. John C. Hopper that you had not any recollection that Garret J. Hopper declared the paper to be his will? A. I did not.

Q. Have you not told Mr. John C. Hopper that you had no recollection of that paper being declared by Mr. Hopper to be his will? A. I don't know that I did; I told him that I did not recollect that I had witnessed the will when he came in; that is the only recollection I have of any conversation I had with him; that is the only answer that I made to him.

Q. Did you not tell Mr. John C. Hopper, a few days before the call with Mr. Cochran, when you were taking lunch with him one day, that until he, John C. Hopper, told you, you had no idea that there was a will? A. It was not then that he told me.

Q. Did not you then tell him at the time you lunched with him that until he previously told you there was a will, you had not any idea that there was any will? A. I told him that I had forgotten it, or rather did not recollect it.

Q. Did you not tell him exactly what I tell you? A. I have no recollection of saying that.

Q. Will you state that you did not tell Mr. John C. Hopper at that time that you had no idea that there was a will? A. I had no recollection of witnessing the will; I don't recollect that there was any such conversation between us; I remember our going to Delmonico's, and there might have been some general conversation.

Q. Did you not then state to Mr. John C. Hopper, that until he informed you that there was a will that you had no idea that there was one? A. I have no recollection of saying anything of the sort; if I did, it has escaped my memory; I don't recollect it at all.

Q. Will you be positive that you did not so state? A. I am positive that I have no recollection of stating it.

Q. Will you be positive that you did not so state to Mr. Hopper? A. I have no recollection at all about it.

Q. Will you be positive? A. I don't recollect anything about it.

Q. Will you be positive that you did not so state; will you swear, in unhesitating terms, that you did not state to Mr. Hopper that you had no idea that there was a will until he informed you of it? A. I have no recollection of anything of the sort being said there at all.

Q. Will you be positive; will you swear to it as a fact that cannot be doubted? A. I am not positive.

Q. State all that you will swear, of positive recollection, transpired from the time your attention was first called to Mr. Hopper until he left the bank; give the words he used? A. He came in, and drew the instrument out of his pocket, and asked me to witness it, and made a declaration; what the words were I don't recollect; asked me to witness it, and asked me to go around and ask Mr. Banta to do the same.

Q. That is all that you recollect? A. I recollect witnessing it, signing my name to it; there was not much conversation beyond that he made a declaration.

Q. You have told us that? A. That is all that I recollect now; that is all that I recollect at present.

Q. Did you not, in an interview with John, at Delmonico's, in answer to his asking you, "George, are you one of father's executors?" say, "I don't know whether I am or not; I don't know that he left a will?" A. No, sir; I have no recollection of talking much about the will; we did not go there for the purpose of talking about it.

Q. Will you state that what I have asked you did not take place? A. I have no recollection of anything of that sort taking place.

Q. Will you be positive that that conversation did not pass between you and Mr. Hopper? A. A great many things might have transpired that I don't recollect; I have no recollection of any such conversation; no recollection at all.

Q. Will you swear positively that it did not? A. I only say, as I said before, that I have no recollection of any such conversation taking place there; I was there a short time, and two or three other gentlemen were with me; we did not go there for the purpose of talking about the will.

*Re-direct examined:*

Q. Do you recollect whether you were all together when it was executed, the witnesses and Hopper? A. I recollect Mr. Banta came there when it was executed.

Q. How was it with Mr. Quackenbush? A. He was at my desk, and Mr. Banta came around at my request.

James W. Quackenbush, called for proponents, testified:

Q. Look at that paper (the paper propounded), and state whether you saw Mr. Hopper sign that, or where you first saw the paper? A. I first saw the paper in the bank.

Q. At the time stated by the last witness? A. Yes, I don't remember about his signing it.

Q. Do you recollect his having it in his hand? A. Yes; or, rather, I think it laid on the desk when I was called.

Q. In front of him? A. Yes, sir.

Q. Did you sign it? A. I did, sir.

Q. As a witness? A. Yes, sir.

Q. At whose request?

[Counsel for contestant objects that the proper question is for the witness to state all that he recollects to have

transpired at the time of the execution, and objects to the question as put.   Objection sustained.]

A. I am not positive whether Mr. Hopper spoke to me over the desk, or Mr. Achenbach came to me at my desk.

. [Answer overruled.]

Q. State, if you please, all that transpired from the time you saw Mr. Hopper, on the day of your signing that paper, until he left the bank, all that you recollect? A. I remember signing it at Mr. Achenbach's desk; I signed it at Mr. Achenbach's desk; whether Mr. Achenbach had signed it before me at that time or not I don't remember; and Mr. Hopper spoke, pointed his hand to it, and made some remark respecting the will—about a will; what it was I cannot say, but I am positive it must have been this declaration (referring to the paper propounded).

[Contestant's counsel objects to the last clause of answer.]

Q. Who were present at that time? A. Mr. Hopper, Mr. Achenbach, and whether Mr. Banta came to the desk at the time I was there, I think he did; I think he did; I think he came just as I was leaving; I feel satisfied that he came there before I left the desk.

Q. Can you recollect where the paper laid at the time of signing? A. On Mr. Achenbach's desk.

Q. Did you not tell John C. Hopper and Cochran that you did not know what the paper you signed was when you signed it? A. No, sir; I did not; I never sign a paper unless I know what it is, something about it.

Q. Did not you also tell them at that time that you did not know until after Mr. Hopper's death that he had ever made a will? A. No; I did not use those words; I have told him that I was not aware that I was a witness to his will; I had forgotten that I was a witness to his will; I had forgotten then; Mr. Achenbach told me afterwards that I had signed it with him; then it came

back to me; I had forgotten the circumstance; I told him at the same time that I remembered his father having been in the bank some time before, and brought some paper; what it was I did not remember then.

Q. Did you see Mr. Hopper when he came in the bank, at the time the paper was executed ? A. No; not when he first entered, as I said before; I don't know whether he stopped at my desk, or Achenbach called me to his desk; my impression is that Mr. Achenbach told me, or as he says, I might have been standing by his desk at the time; I don't know which.

Q. You did not read anything at the time ? A. I am satisfied I must have read that at the time of signing it.

[Contestant's counsel moves to strike out the answer of the witness as incompetent and irresponsive. The answer is overruled and stricken out.]

Q. Where was the paper when you first saw it ? A. On Mr. Achenbach's desk.

Q. Was it prepared for the witnesses to sign ? A. Yes, sir; I think Mr. Achenbach must have signed it prior to my coming there; he may have signed it at the time, but I don't recollect particularly about that; but it was open at any rate.

Q. Up to the time that you came to Mr. Achenbach's desk, had you had any conversation that you can now recall with Mr. Hopper ? A. I think not, unless he spoke as he passed my desk to go to sign the paper.

Q. You don't recollect any conversation ? A. No, sir; if there was any, it was merely that; I doubt that there was any.

Q. Can you state positively anything which you will say you heard Mr. Hopper himself say, while he was in the bank ? A. No; I can state what I believe to the best of my recollection he said; I won't swear positively, because a good many things occurred that I don't remember.

Q. Is it your best recollection that Mr. Achenbach

had signed the paper when you reached his desk? A. No; I am not satisfied which way it was, whether he signed it after I came there, or had signed it when I came; I know it was signed before I signed it.

Q. Can you recollect positively that Mr. Achenbach did come and ask you to sign the paper? A. No.

Q. Can you recollect positively anything to have been said by Mr. Achenbach, in your hearing, while Mr. Hopper was in the bank? A. No.

Q. Did you, when Mr. John C. Hopper first had a conversation with you after his father's death, have any recollection that you had ever signed this paper? A. No; I did not remember that at that time.

Q. Did you at that time have any recollection of anything which had transpired when this paper was executed? A. Immediately after his speaking about whether I remembered I had signed a will, I told him I did not remember; I then told him at that interview that I remembered his father's coming in and my signing some paper that laid before me; I and Mr. Achenbach; and I did not remember what the paper was.

Cornelius V. Banta, called for proponents, testified:

Q. State all that transpired from the time Mr. Hopper came into the bank, until he left it, as far as you know? A. In the morning, at a certain time, Mr. Achenbach came to me and said Mr. Hopper wanted to see me; I then went down to Mr. Achenbach's desk, which is a short distance from mine; he then asked me if I would witness his signature; I said "yes;" in the morning, generally there is considerable confusion; I had my work to attend to, and left him; I said "when you are ready, you will call me;" I guess it was some five minutes after that, he called me down there; there is a railing in front of the desk, that came up just about his eyes; while he was standing there with the document, I took a pen; I don't know from whose hand; the ink was still wet; I took a blotter and blotted it myself, and Mr. Hopper

made mention something about signing his testament, or something like that; it was finished.    On account of the grating before me, it is impossible for me to say the exact words, but at the time I understood it as such, and I signed it as such.    [Objected to.]    I signed that document, and that was the end of it; I went to my desk.

Q. At whose request was it done?

[Objected to; overruled.]

Q. State what was said in reference to that, to your best recollection?  A. Mr. Quackenbush was on my right, Mr. Achenbach on my left, at the time; I signed it, and Mr. Hopper stood right in front of me, with the grating between us.

Q. What is your best recollection as to what Mr. Hopper stated at the time?    A. That it was his last will.

Q. Is there any circumstance which occurred from which you are enabled to refresh your memory as to what the paper was said to be at the time it was executed?  A. That occurred at the time?

Q. Immediately subsequent?  A. Yes, sir.

Q. I ask you what that circumstance was.

[Objected to; objection overruled; exception taken.]

A. I related to my father and mother that I had signed Mr. Hopper's will.

Q. When was it?  A. The same evening.

Q. Did you see anybody else sign the paper?  A. No, sir; as I told you previously, the ink was wet, and I blotted it myself, and took the pen either out of Achenbach's or Quackenbush's hand.

Q. You did not see either of the other witnesses sign it?  A. No, sir.

Q. Did you only stay long enough to sign the paper?  A. That is all.

Q. Will you swear positively that anything was said by Mr. Hopper during the time that you were at Mr. Achenback's desk?  A. Yes, sir.

Q. Can you state what was said by him while you were

at Mr. Achenbach's desk? A. No; I cannot state the exact words at all.

Q. Can you state anything which you will positively swear to have been said by Mr. Hopper while you were at Mr. Achenbach's desk? A. No more than I have previously stated.

Question repeated. A. I scarcely know how to answer, that I can state positively.

Q. Can you state anything you will swear positively was said? A. Yes, sir; I can state this much as to what he said, that the impression left on my mind—

Q. I don't ask that. Do you remember Mr. John C. Hopper calling upon you with Mr. Thomas Cochran, after Mr. Hopper's death? A. Mr. Hopper called upon me with somebody.

Q. Did you have any conversation about the execution of this paper at that time? A. I did.

Q. Did you tell those gentlemen that you had no recollection of anything that transpired, except that Mr. Hopper asked you to witness the execution of a paper? A. No; I believe I told them in the first place that I did not recollect signing it; I think that was it, and I think I made the remark to them also, that it being a part of my duty to certify signatures and indorsements, it was almost impossible for me to recollect any circumstance like that; that if it had been done at a private house, or outside of my business, I might have recollected it.

Q. Did not you, when Mr. Hopper informed you that your name appeared to this paper, state that all that you could recollect was that Mr. Garret J. Hopper had asked you to witness some paper, but what it was you could not tell? A. Yes, I very likely did.

Q. Did you tell the truth in making that statement? A. I did, according to the best of my ability, as far as my recollection served me at that time.

Q. Do you mean to say at that time you had no recollection that you ever had executed a paper which you

knew to be Mr. Hopper's will? A. I had not the slightest idea until I was told my name was there, that I had ever put my name upon the paper at all; when he told me I said so.

Q. Have you talked this matter over with Mr. Achenbach? A. Yes, sir; I have, but not a great deal.

Q. Have you talked it over with Mr. Quackenbush? A. Yes.

Q. Have you talked on the subject with Mrs. Hopper or Mrs. Martling? A. Yes.

Q. Have you with Mr. Wagner? A. I don't know whether the conversation turned on that point or not.

Q. Have you had any conversation on the subject of the execution of this paper with Mr. Wagner? A. I don't think I have; I might, and might not.

Q. Can you remember anything said by Mr. Achenbach while Mr. Hopper was in the bank? A. No; I was not there long enough.

Question repeated. A. No, sir.

Q. Can you recollect anything that was said by Mr. Quackenbush while Mr. Hopper was in the bank? A. No, sir.

Q. Do you recollect that Mr. Quackenbush was at Mr. Achenbach's desk when you reached there? A. I am quite certain he was.

Q. Who left the desk first? A. I did.

Q. Do you think Mr. Quackenbush was there when you left the desk? A. As far as I know, I cannot tell anything about it; I left him there, or in the vicinity.

Q. You left him at or near the desk? A. Yes, sir.

Q. Will you state positively that the word "testament" was used while Mr. Hopper was in the bank, in your hearing? A. It was either will or—

Q. Will you state positively that the word "testament" was used? A. I cannot swear positively.

Q. Will you swear positively that the word "will" was used while Mr. Hopper was in the bank? A. I will swear just this—

Question repeated.  A. To the best of my recollection.

Q. No!  A. I cannot give it in any other way.

[Objected to.]

Q. (By the Court.)  Answer positively?  A. No; I cannot swear positively.

John C. Hopper, called for contestants:

Q. You are son of Garret J. Hopper?  A. Yes.

Q. Do you know Mr. Achenbach, Mr. Banta, and Mr. Quackenbush, whose names appear to that paper?  A. I do, sir.

Q. Did you, subsequently to the death of your father, call upon these gentlemen in reference to the execution of that paper, with Mr. Thomas Cochran, Jr., from my office?  A. I did; yes, sir.

Q. Did you see each of them?  A. I did.

Q. About how long after your father's death was it?  A. Well, immediately after; probably five days.

[It is admitted, on the statement of contestant's counsel, that Thomas Cochran has gone to California.]

Q. State what was said by Mr. Achenbach with reference to the execution of the paper?

[Objected to, on the ground that no foundation has been laid for impeaching testimony, the matter having originally been drawn out on the cross-examination of the subscribing witnesses, they then stating only that they had no recollection of the conversation.  Objection overruled.  Exception taken.]

A. I called on Mr. Achenbach at the bank, and proposed that we should go down and take a lunch together, and, in connection with one or two friends of his, we went; we took a seat, and while taking lunch I said, "Achenbach, I wonder whether father made a will; you used to be a pretty good friend of his, and if so, you are probably one of the executors?"  He said, "I don't know anything about a will."  Said he, "Has your father made a will?"  I said, "I don't know; we are going to open the will in one or two days, and then we will know."

Q. What did he tell you when you were with Cochran? A. He told Cochran that he had no idea of a will, but he had the impression, after he left the bank, that it might be a will, but at the time he had no idea it was a will; but after he left the bank, his impression was that Mr. Hopper might have made a will, because he had come there so hurriedly; he had the will folded up; he asked for the signatures, and then rushed right out of the bank.

Q. What did Mr. Quackenbush say?

[Same objection, ruling, and exception.]

A. After that I took Mr. Cochran to the desk of Mr. Quackenbush and asked Mr. Quackenbush about it, and Quackenbush said he did not recollect anything about it; he had no distinct recollection of anything of the kind, but that he would try to think of it; he was busy at the time; he had some faint idea that Mr. Hopper did come in the bank, but when he did come in he could not have been there over three or four minutes.

Q. What did Mr. Banta say? A. Banta said positively that there was nothing mentioned in regard to the will or anything of the kind; nothing at all about it; he was simply asked to witness a paper; he did not know whether it was a will or not, or what it was; that it took about one second, and then he went about his business.

*Cross-examined:*

Q. You stated to Mr. Achenbach, five days after your father's death, that you supposed your father had left a will? A. No, sir; I went to him with the view of ascertaining whether he thought so, and if he was one of the executors; that was about five or six days afterwards, about a week; I cannot remember; it was before the will was opened that I went there for the purpose.

Q. You have received in your lifetime considerable sums of money from your father?

[Objected to; objection sustained; exception taken.]

THE SURROGATE. The contest of this will is made solely upon the question of its formal execution in the manner in which testamentary instruments are required to be executed under our statute. The Surrogate has simply to find, as a question of fact, whether the requirements of the statute have been complied with.

The paper appears to have been drawn up by the decedent himself. He took it into a banking house in the middle of the day, when everybody employed therein was busy, stepped up to the desk of a clerk whom he knew, took the paper out of his pocket, asked for a pen to sign it, and it was signed by himself and by this clerk, and subsequently by two of his associate clerks. There was no professional person, no lawyer, present; and it does not appear that any of those who were present were aware of the statutory requirements in relation to acknowledgment or declaration, and rogation to witnesses. There is no connected or coherent relation of what did take place.

What was said and done on this occasion is not as clear as it ought to be, to establish an affirmative. Achenbach recollects that the decedent "made a declaration," and asked him, Achenbach, "to testify to it." The witness has "an impression," that this declaration was, that that was his last will and testament, but this "impression" of his does not amount to a recollection. The presumption is very strong from this witness' whole testimony, that the impression which is upon his mind, has been derived from conversations had with lawyers since the death of the decedent, in which conversations he was first informed what were the requisites for a due execution of a will.

The circumstances attending the signing of the paper propounded, appear to have been, at one time, entirely forgotten by this witness, until recalled by a conversation he had with the contestant. He cannot state the purport of this conversation, however, for his testimony throughout is of the *non mi recordo* description. If the contestant

is to be believed, Achenbach, after the death of decedent, denied all knowledge of a will.

The witness Quackenbush, also a bank clerk, heard Hopper speak and make some remark about "the will, or a will," pointing his hand to it; what was said by decedent the witness cannot say, but he "is positive it must have been this declaration;" but he cannot state what the decedent did say. This witness did not afterwards remember what the paper was that he had signed.

The third clerk, the witness Banta, signed the paper after the decedent "made mention something about singing his testament, or something like that." His best recollection is, that Hopper stated that the paper "was his last will;" and the same evening, this witness said to his father and mother, that he had "signed Mr. Hopper's will." This witness did not afterwards remember that he had signed this or any paper for the decedent; in fact, all three of the witnesses had at one time forgotten that any such event as their witnessing this paper had occurred.

From this testimony I am to find whether the decedent subscribed the paper propounded, in the presence of each attesting witness, or acknowledged his subscription to each. I think he did not.

Whether he declared the paper to each of them to be his will. I think he did not.

Whether he asked each of them to sign as witnesses to his will. I think he did not.

It is an inevitable conclusion from the testimony, that the decedent executed the paper as though he were executing a deed or bill of sale; he signed it and asked them to sign it; that was all. Our statute does not intend that testamentary dispositions shall be made thus informally and hastily, in the midst of business preoccupations, and without the safeguards which, in any well regulated community, are placed around the bequests and devises of property. In the absence of legal advice,

in the hurry and crush of bank business, and among persons ignorant of what the statute directs in such cases, I do not think the chances are in favor of a legal and formal execution.

Probate denied.